# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

KELLY A. SPRATT, a married woman, )
                                     )    No. 70505-9-I
               Respondent,   )
                                     )    DIVISION ONE
            v.                 )
                                     )    PUBLISHED OPINION
BRADLEY TOFT, and his wife, JILL   )
TOFT, and the marital community     )
composed thereof,                 )
                                     )    FILED: April 21, 2014
               Appellant.     )

GROSSE, J.P.T.[1] — To succeed on a special motion to strike under Washington's anti-SLAPP statute,[2] the moving party must make an initial prima facie showing that the claimant's suit arises from an act in furtherance of the right of petition or free speech in connection with a matter of public concern. Campaigning and speech connected to a political campaign and candidate clearly involve free speech and clearly are matters of public concern. Accordingly, we vacate the trial court's denial of Bradley Toft's motion to dismiss, and we remand for consideration of whether Spratt establishes by clear and convincing evidence, a probability of prevailing on her defamation claim.

## FACTS

From 2001 until December 2005, Kelly Spratt worked at Quadrant Home Loans, a joint venture between Wells Fargo Bank and Quadrant Homes. Toft, as King County sales manager, was Spratt's immediate supervisor. Toft reported to

---

[1] Judge C. Kenneth Grosse was a member of the Court of Appeals at the time oral argument was heard on this matter. He is now serving as a judge pro tempore of the court pursuant to RCW 2.06.150.
[2] Washington Act Limiting Strategic Lawsuits Against Public Participation.

Randy Smith. When Smith was promoted to vice president and regional sales manager for Wells Fargo Home Mortgages, Toft reported to Rich Osburn, Smith's replacement. Spratt was repeatedly promoted during her time at Quadrant and was never the subject of a performance improvement plan. In 2005, she was promoted to sales manager for the south region of King County, overseeing branch offices.

Smith and Spratt both assert that Toft had a reputation for being untrustworthy and manipulative and that the company had an issue with his management style. Smith's declaration establishes that Toft's management style was the subject of numerous intra-company meetings. Spratt observed Toft's abusive behavior in which he made employees cry and, in one instance, swung a baseball bat at Spratt's head.

Without justification, in December 2005, Toft accused Spratt of unethical behavior. There was no threat of termination or request that she resign. The following day, Spratt reported to Osburn and Smith that she could no longer tolerate Toft's abusive behavior and she was going to resign. Smith's declaration supported Spratt's version of the events and Smith apologized to Spratt for Toft's behavior. Smith told Spratt that he appreciated hearing her reason for resigning. The next day, Spratt tendered her resignation to Toft who circulated an e-mail to employees at Quadrant acknowledging that Spratt had resigned.

A few weeks after her resignation, Osburn (Toft's supervisor) called Spratt and offered her employment at Washington Square, another Wells Fargo joint venture. Spratt accepted the position under the condition that she would not

2

have to interact with Toft. Smith's declaration confirms that such an offer would not have been made if Spratt had been under a cloud at Quadrant when she left:

> The fact that Ms. Spratt was re-hired for the Washington Square project is thus unassailable proof that she was neither terminated for cause at Quadrant Home Loans, nor allowed to quit in place of being terminated.

Smith's declaration further notes that Toft's mischaracterization of Spratt's resignation is not surprising:

> Based upon my experience with Mr. Toft, I am not surprised he is making allegations about Ms. Spratt's employment record that are unsubstantiated by the facts.

Smith stated that he was aware of Toft's problems with several subordinates, which resulted in an unusually high turn-over rate for the employees who worked directly with him:

> As a result of that, and other issues regarding his performance, I and our Quadrant partner made the decision to involuntarily terminate Mr. Toft's employment at Quadrant Home Loans in December 2006. Unfortunately in many respects he was my worst hire in 16 years of employment at Wells Fargo Bank.

Evidence was presented that Toft was involuntarily terminated because he failed to perform job duties.

Spratt had no contact with Toft from December 2005 until December 2011, when she read that Toft was running in the Republican primary for the Washington State Senate in District 5. Spratt sent Toft a private e-mail via Facebook questioning his qualifications for office.

Spratt, who considers herself a Republican, decided to contact the Republican Party to let them know of her concerns. She sent a letter to Bob Brunjes, the 5th District Chair of the Republican Party. As a result of that letter,

3

Jolie Imperatori, an active member in the 5th District, contacted Spratt and suggested that Spratt give Toft an opportunity to respond to her accusations by attending a public meeting. In March 2012, Spratt went to a "meet-and-greet" the candidate meeting. Spratt went to the meeting to ask Toft questions regarding his termination of employment at Quadrant. Imperatori accompanied Spratt to the meeting.

Before the start of the campaign event, Toft had a private meeting with Ramzy Boutros, the co-vice chair of the 5th District Republican Party, Jill Toft, and Ferrin Lauve, another official with the party. Boutros attended the meeting as a private citizen to determine whether he would support Toft's candidacy. After the meeting and before the event was scheduled to start, Toft asked to speak privately with Boutros. Toft told Boutros that someone he had fired years before had come to the meeting and he wanted to exclude her. This conversation occurred outside the meeting.

Declarations supplied by Spratt, Imperatori, and Boutros set out the details of what occurred at the meeting. When Spratt was finally called on by Toft, she related the incident where he swung a baseball bat at her head and asked whether he would admit that he had been fired from Quadrant. At that time Spratt was unaware that Toft had wanted to exclude her from the meeting and had told Boutros that he had fired her.

In May 2012, Spratt attended a Republican Precinct Committee Officers (PCO) meeting at the Issaquah police station for the express purpose of confronting Toft regarding his lies concerning her employment history. She

brought her phone with the e-mail that he had sent in 2005 to other Quadrant employees informing them that Spratt had resigned. Before the meeting, Imperatori overheard Toft telling several PCOs that he had fired Spratt and that she was trying to get even with him by spreading false rumors about him. Pushed by Boutros, Toft stated that Spratt had been forced to resign.

Spratt was called on at the meeting and Toft refused to confirm one way or another that he had fired Spratt. Spratt had no direct contact with either Toft or his wife after the May 2012 PCO meeting. She did, however, post on her own Facebook and Twitter accounts her ongoing opposition to Toft's campaign. In June 2012, Toft's counsel sent Spratt a letter accusing her of harassing Toft. Spratt blocked her Twitter and Facebook accounts preventing the Tofts from seeing her postings.

In August 2012, the Tofts filed an anti-harassment petition against Spratt in district court alleging recent contact. Counsel for Spratt appeared. The petition was not granted; no anti-harassment order was issued. In October 2012, an "anonymous" letter surfaced concerning Spratt. It attached copies of materials filed in the anti-harassment action and specifically referenced what a good candidate Toft made for the Senate. Spratt was in the process of proving that the letter was, in fact, written by Toft and produced evidence of a declaration from a Web expert who stated that the materials attached in the letter were not in fact from the anti-harassment action, but in fact were taken from Toft's computer at a later time and could only have been done with a password by the user, Toft.

Spratt sued to recover damages for these defamatory statements that were made about her by Toft. Spratt based her cause of action on Toft's oral statements to others that he had fired Toft and on various defamatory allegations that were contained in the anonymous letter. Toft moved to strike Spratt's claims under RCW 4.24.525(4)(b) on the grounds that it was a strategic lawsuit against public participation. The trial court denied Toft's motion by order and, finding Toft's motion to strike frivolous, awarded Spratt $23,109.85 in fees and costs and $10,000 in sanctions under RCW 4.24.525(6)(b). The trial court also denied Toft's motion for reconsideration. Toft appeals.

## ANALYSIS

A party may bring a special motion to strike "any claim that is based on an action involving public participation and petition." RCW 4.24.525(4)(a). In deciding an anti-SLAPP motion, a court must follow a two-step process.[3] A court's interpretation and application of the anti-SLAPP statute is reviewed de novo.[4] A party moving to strike a claim under RCW 4.24.525(4)(a) has the initial burden of showing by a preponderance of the evidence that the claim targets protected activity, i.e., activity "involving public participation and petition" as defined in RCW 4.24.525(2).[5] If the moving party meets this burden, the burden shifts to the responding party "to establish by clear and convincing evidence a probability of prevailing on the claim." RCW 4.24.525(4)(b). If the responding

---

[3] Dillon v. Seattle Deposition Reporters, LLC, __ Wn. App.__, 316 P.3d 1119, 1132 (2014).
[4] City of Seattle v. Egan, __ Wn. App __, 317 P.3d 568, 569 (2014); Dillon, 316 P.3d at 1133.
[5] United States Mission Corp. v. Kiro TV, Inc., 172 Wn. App. 767, 783-84, 292 P.3d 137, rev. denied, 177 Wn.2d 1014, 302 P.3d 181 (2013).

party fails to meet its burden, the court must grant the motion and award the moving party $10,000 in addition to attorney fees and costs. RCW 4.24.525(6)(a)(i), (ii).

Under RCW 4.24.525(2), actions involving "public participation and petition" include:

> (a) Any oral statement made, or written statement or other document submitted, in a legislative, executive, or judicial proceeding or other governmental proceeding authorized by law;

> (b) Any oral statement made, or written statement or other document submitted, in connection with an issue under consideration or review by a legislative, executive, or judicial proceeding or other governmental proceeding authorized by law;

> (c) Any oral statement made, or written statement or other document submitted, that is reasonably likely to encourage or to enlist public participation in an effort to effect consideration or review of an issue in a legislative, executive, or judicial proceeding or other governmental proceeding authorized by law;

> (d) Any oral statement made, or written statement or other document submitted, in a place open to the public or a public forum in connection with an issue of public concern; or

> (e) Any other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public concern, or in furtherance of the exercise of the constitutional right of petition.

Washington's anti-SLAPP statute, like others around the country, was enacted to prevent the chilling of a citizen's legitimate right to free speech. To this purpose, the Washington legislature found that "[i]t is in the public interest for citizens to participate in matters of public concern and provide information" on public issues that affect them "without fear of reprisal through abuse of the

judicial process."[6] The legislature provided that the act "shall be applied and construed liberally to effectuate its general purpose of protecting participants in public controversies from an abusive use of the courts."[7] It explained that the new law was enacted to protect statements on matters of public concern, which is the "sine qua non of democracy."[8] Equally, at the heart of our democracy is the election of candidates to office. Toft has a protected right to speak in furtherance of his candidacy.[9] Toft's action to combat accusations against him while he was campaigning for office clearly falls within those protected rights. At this juncture, we do not address the merits of Spratt's complaint, only whether it falls within the realm of protected activity.

Here, Spratt came to two of Toft's campaign events with the specific purpose of challenging whether he was fit for office because of his past employment record. In addition, Spratt sent information to the Republican Party that Toft was discharged from his job. Toft contends that the statements he made about Spratt were in response to Spratt's challenges and thus were protected activity undertaken in the heat of a campaign.[10]

---

[6] LAWS OF 2010, ch. 118, § 1.

[7] LAWS OF 2010, ch. 118, § 3; Henne v. City of Yakima, 177 Wn. App. 583, 594, 313 P.3d 1188 (2013).

[8] Bruce E.H. Johnson & Sarah K. Duran, A View From the First Amendment Trenches: Washington State's New Protections For Public Discourse and Democracy, 87 Wash. Law. Rev. 495, 499, 509 (2012) (quoting Robert C. Post, Democracy, Expertise, and Academic Freedom: A First Amendment Jurisprudence For The Modern State 15 (2012)).

[9] Greater Los Angeles Agency on Deafness, Inc. v. Cable News Network, Inc., 742 F.3d 414, 434 (9th Cir. 2014).

[10] See Rosenaur v. Scherer, 88 Cal. App. 4th 260, 105 Cal. Rptr. 2d 674 (2001).

Washington's 2010 anti-SLAPP statute was patterned after California's anti-SLAPP statute.[11] Thus, we can look to California cases for aid in interpreting the act.[12] Toft cites Cabrera v. Alam,[13] to support his argument that his statements were public activity. In Cabrera, the court held that a homeowners' association meeting was a public forum. Cabrera involved two people who were both campaigning for election to the homeowners' association board. Cabrera, a past president, was standing in for one of the candidates competing for election to the board. Cabrera accused Alam, the challenging candidate for director, of mismanaging the association's financings. In response, Alam accused Cabrera of defrauding the association and stealing money from it.[14] Cabrera sued Alam for defamation based on the statements made at the annual meeting, precisely what Spratt is doing here.

The second case Toft relies on is Rosenaur v. Scherer.[15] There, the court found that the "use of the words 'thief' and 'liar' in the course of a chance confrontation with a political foe at a shopping center was the type of loose, figurative, or hyperbolic language that is constitutionally protected."[16] The Rosenaur court determined that the defendant was criticizing the plaintiff's

---

[11] Compare RCW 4.24.525 with Cal. Civ. Proc. Code § 425.16; Phoenix Trading, Inc. v. Loops LLC, 732 F.3d 936, 941 (9th Cir. 2013); Aronson v. Dog Eat Dog Films, Inc., 738 F. Supp. 2d 1104 (W.D. Wash. 2010).

[12] Phoenix Trading, 732 F.3d at 941; City of Longview v. Wallin, 174 Wn. App. 763, 776 n.11, 301 P.3d 45, rev. denied, 178 Wn.2d 1020, 312 P.3d 650 (2013).

[13] 197 Cal. App. 4th 1077, 129 Cal. Rptr. 3d 74 (2011).

[14] Cabrera, 197 Cal. App. 4th at 1081.

[15] 88 Cal. App. 4th 260, 105 Cal.Rptr.2d 674 (2001).

[16] Rosenaur, 88 Cal. App. 4th at 278-80.

political position, rather than accusing the plaintiff of the crime of theft. The Rosenaur court stated:

> It is well settled that section 425.16 applies to actions arising from statements made in political campaigns by politicians and their supporters, including statements made in campaign literature. (*Conroy v. Spitzer* (1999) 70 Cal.App.4th 1446, 1451 [83 Cal.Rptr.2d 443]; *Beilenson v. Superior Court* (1996) 44 Cal.App.4th 944, 950 [52 Cal.Rptr.2d 357]; *Matson v. Dvorak, supra,* 40 Cal.App.4th at p. 548; *Robertson v. Rodriguez* (1995) 36 Cal.App.4th 347, 352, 357-358 [42 Cal.Rptr.2d 464].) "The right to speak on political matters is the quintessential subject of our constitutional protections of the right of free speech." (*Matson v. Dvorak, supra,* 40 Cal.App.4th at p. 548.)[17]

Toft argues that his statements fall within the scope of the act because they were made by a political candidate on the campaign trail to party officials, party members, and the voting public about a candidate's employment history in response to allegations by a person who attended political events and challenged that candidate's qualifications. Speech involves "matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community."[18] Toft's actions clearly fall within protected activity and thus fall within the ambit of the statute. Toft has satisfied the first prong of the anti-SLAPP statute.

Ironically, had Toft sued Spratt, Spratt would arguably have had a cause of action under that same statute for Toft's claims. We are not unmindful of the absurdity of such a circumstance and recognize, but do not decide, the

---

[17] 88 Cal. App. 4th at 273-74.
[18] Snyder v. Phelps, __ U.S. __, 131 S. Ct. 1207, 1216, 179 L. Ed. 2d 172 (2011) (quoting Connick v. Myers, 461 U.S. 138, 146, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983)).

conundrum presented by the statute in this situation.[19] However, Spratt interjected herself into the public process of a candidate running for office by attacking his credentials to hold office, a matter of public concern. Under the facts before us, Toft has met the minimal standard needed to prove his case falls within the ambit of the statute.

Having determined that Toft has met the threshold burden of the anti-SLAPP statute, the burden shifts to Spratt to show, by clear and convincing evidence, a probability of prevailing on her defamation claim.[20] If Spratt meets this burden, then Toft's motion to strike her claim must be denied. RCW 4.24.525(4)(b). Because the trial court did not address this secondary question, we remand for consideration of whether Spratt establishes a probability of prevailing by clear and convincing evidence. Indeed the court's oral ruling specifically states that it did not decide the merits of the case, but only whether the defamation lawsuit should be stricken. The trial court's ruling shows that it never examined the statements and declarations to determine whether triable issues of material fact existed under any standard.

However, the trial court did rule that the anti-SLAPP statute was constitutional in response to Spratt's contention that the act was unconstitutional because the provision providing for a mandatory stay on discovery prevented her

---

[19] The trial court appeared to recognize the dilemma that Toft's efforts to combat Spratt's challenges may have violated Spratt's right to petition by awarding fees and penalties in dismissing the suit at the outset.

[20] American Traffic Solutions, Inc. v. City of Bellingham, 163 Wn. App. 427, 260 P.3d 245 (2011) (quoting RCW 4.24.525(4)(b)).

from proving her defamation claim, denying her access to the courts. Because this issue will most certainly come up on remand, we address it here.

Washington courts have held that discovery is a necessary element in preserving access to the court, citing article I, section 10 of the Washington Constitution. In John Doe v. Puget Sound Blood Center,[21] the court held that a litigant's constitutional right of access to the courts carries considerable weight when balancing the public and private interests against the necessity of a protective order under CR 26(c). Plaintiffs have a right of access to the courts. In a civil case that right includes the right of discovery authorized by the civil rules, subject to the limitations contained in those rules.

In Putman v. Wenatchee Valley Medical Center, P.S.,[22] the court held unconstitutional RCW 7.70.150's requirement that a plaintiff file a certificate of merit before proceeding to court. Putman held that the certificate of merit requirement unduly impaired the right of access to the courts because it required parties to present evidence that might be impossible to develop without discovery.[23] The court held that the requirement to file a certificate of merit violated the separation of powers doctrine because it conflicted with CR 8 and 11 regarding pleading requirements and thereby encroached on the judiciary's power to establish court rules.[24] The court stated:

---

[21] 117 Wn.2d 772, 819 P.2d 370 (1991).
[22] 166 Wn.2d 974, 216 P.3d 374 (2009).
[23] Putman, 166 Wn.2d at 977-78; see also Waples v. Yi, 169 Wn.2d 152, 234 P.3d 187 (2010) (holding 90-day notice requirement in the same statute unconstitutional because it conflicts with the commencement requirement of CR 3(a) thereby conflicting with the judiciary's power to set court procedures.)
[24] Putman, 166 Wn.2d at 979-80.

12

"The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection." *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 163, 2 L. Ed. 60 (1803). The people have a right of access to courts; indeed, it is "the bedrock foundation upon which rest all the people's rights and obligations." [*Puget Sound Blood Ctr.,* 117 Wn.2d at 780.] This right of access to courts "includes the right of discovery authorized by the civil rules." [*Puget Sound Blood Ctr.,* 117 Wn.2d at 780]. As we have said before, "[i]t is common legal knowledge that extensive discovery is necessary to effectively pursue either a plaintiff's claim or a defendant's defense." [*Puget Sound Blood Ctr.,* 117 Wn.2d] at 782].[25]

Washington courts derive their judicial power from article IV of the state constitution and from the legislature under RCW 2.04.190.[26] That inherent power includes the power to govern court procedures.[27] Where a statute and a court rule conflict, the court will attempt to harmonize them, giving effect to both.[28] Where, however, the two cannot be harmonized, the court rule prevails in procedural matters and the statute in substantive matters.[29] Here, however, there is no real conflict.

RCW 4.24.525(5)(c) provides:

All discovery and any pending hearings or motions in the action shall be stayed upon the filing of a special motion to strike under subsection (4) of this section. The stay of discovery shall remain in effect until the entry of the order ruling on the motion. Notwithstanding the stay imposed by this subsection, the court, on motion and for good cause shown, may order that specified discovery or other hearings or motions be conducted.[30]

---

[25] Putman, 166 Wn.2d at 979.
[26] City of Fircrest v. Jensen, 158 Wn.2d 384, 394, 143 P.3d 776 (2006).
[27] Fircrest, 158 Wn.2d at 394.
[28] Fircrest, 158 Wn.2d at 394.
[29] Putnam, 166 Wn.2d at 980.
[30] (Emphasis added.)

Thus, although discovery is stayed initially as part of the motion and until a ruling, the trial court is permitted to allow discovery or hold hearings if good cause is shown. The mere fact that discovery is limited does not in and of itself render a statute unconstitutional. For example, in In re Estate of Fitzgerald, this court held that in the context of a Trust and Estate Dispute Resolution Act[31] proceeding, the trial court retains authority to permit discovery before determining whether a creditor's claim is time-barred.[32] Thus, Spratt is not precluded from obtaining discovery before the trial court rules on the motion, provided she can show good cause for such discovery.[33] In Dillon, this court held that the requirement of a showing of good cause to conduct discovery is similar to CR 56(e) which permits a party to obtain discovery when it is essential to justify his opposition to a summary judgment motion.[34]

The issue of whether the statute's heightened burden of proof (clear and convincing evidence) in order to survive the anti-SLAPP motions violates the separation of powers doctrine was also not addressed below. While we need not decide that issue, we believe the burden of proof to be a substantive aspect of a claim and, as such, the statute would prevail.[35] Heightened burdens have been

---

[31] Chapter 11.96A RCW.
[32] 172 Wn. App. 437, 449 n.8, 294 P.3d 720 (2012), rev. denied, 177 Wn.2d 1014, 302 P.3d 181 (2013).
[33] RCW 4.24.525(5)(c).
[34] 316 P.3d at 1142; c.f. Metabolife Int'l, Inc. v. Wornick, 264 F.3d 832 (9th Cir. 2001) (holding subsections 425.16(f) and (g) automatic discovery stay mechanism would not apply in federal court because it conflicts with Federal Rule of Civil Procedure 56).
[35] State v. Gresham, 173 Wn.2d 405, 428-29, 269 P.3d 207 (2012) (quoting Putnam, 166 Wn.2d at 980); Raleigh v. Illinois Dep't of Revenue, 530 U.S. 15,

upheld in other instances, including actions for defamation.[36] This analysis subsumes the question of whether the requirement for clear and convincing evidence of a claim also violates access to the courts because it requires a heightened burden of proof.

The legislature has the right to define the parameters of a claim and to set forth the factors that must be considered before liability can be established.[37] The fact that a statute increases the standard of proof needed for a common law claim does not compromise the right of access to courts.[38] It is within the realm of the legislature's authority to impose a heightened burden of proof. Finally, we note that as recently stated in Dillon, the clear and convincing evidence of a probability of prevailing on a claim is applied in a manner similar to the summary judgment standard.[39]

Because the trial court dismissed the anti-SLAPP action on the first prong, we remand for its consideration of whether Spratt has submitted sufficient evidence for a claim. We reverse the trial court's award of attorney fees, but note that the mere fact that Toft survived the first prong of the anti-SLAPP statute does not relieve him of the possibility of this being a frivolous action, should the trial court find Spratt's claims have clear and convincing merit.

---

120 S. Ct. 1951, 147 L. Ed. 2d 13 (2000) (burden of proof is a substantive aspect of a claim).

[36] Mark v. Seattle Times, 96 Wn.2d 476, 486-87, 635 P.2d 1081 (1981) (In order to combat a defense motion for summary judgment dismissal, plaintiff in a defamation suit must present a prima facie case by evidence of "convincing clarity.").

[37] Sofie v. Fibreboard Corp., 112 Wn.2d 636, 666, 771 P.2d 711 (1989).

[38] Garcia v. Wyeth-Ayerst Labs., 385 F.3d 961, 968 (6th Cir. 2004).

[39] Dillon, 316 P.3d at 1142.

Reversed and remanded.

WE CONCUR: